FIFTH DIVISION
June 11, 2010

No. 1-08-2607


| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 13501 |
| | ) | |
| VONDRAE EDWARD | ) | The Honorable |
| (a/k/a Edward Vondrae), | ) | Joseph M. Claps, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |


PRESIDING JUSTICE TOOMIN delivered the opinion of the court:

In this case we determine, *inter alia*, whether a defendant who has been lawfully seized, has a reasonable expectation of privacy in the contents of a city-owned garbage can in his possession. Following a bench trial, defendant, Vondrae Edward, was convicted of burglary and sentenced to six years' imprisonment. He appeals contending: (1) the trial court erred by failing to quash his arrest and suppress the evidence contained in the garbage can he possessed; and (2) the evidence was insufficient to support his conviction. For the reasons that follow, we affirm.

BACKGROUND[1]

Defendant was charged by indictment with the burglary of A.C. Ballers, a retail store, and theft of personal property belonging to the owner. Prior to trial, defendant moved to suppress the evidence seized contemporaneously with his warrantless arrest, allegedly made without probable cause. Notably, the only information contained in the motion relative to defendant's case was the date and location of his arrest. The remaining allegations of the motion consisted of boilerplate language and offer little insight into the factual basis underlying defendant's motion.

At the hearing on the suppression motion, Officer Salgado testified that during the early morning hours of June 15, 2007, he was on routine patrol with his partner, Officer Otero, in a marked squad car. At about 2:30 a.m., they were in the vicinity of 16th Street and South Pulaski Road in Chicago. The officers were driving down Harding Street, one block east of Pulaski, when they observed defendant walking on the east sidewalk with two men. Defendant and a man named Joseph Ellis each had a hand on a City of Chicago garbage can and were pulling it down the sidewalk. Salgado described that block of Harding as a residential street. The officers had

---

[1] The caption utilized by the parties identifies defendant as "Vondrae Edward a/k/a Edward Vondrae. The Illinois Department of Corrections identifies him as "Edward Vondrae." Defendant's signature on the jury waiver in the present case reflects his name as "Edwards Vondray." When the confusion over his name arose at trial, defense counsel told the court his client's name was "Vondrae Edwards." The trial court, on its own motion, then corrected the indictment, charging "Edward Vondrae," to reflect charges against "Vondrae Edwards," and including an "also known as" designation.

not received any calls concerning thefts or burglaries nor had they heard any alarms sounding in the area.

The officer explained, "Just based on my training, I see three individuals pulling [a] City of Chicago garbage can, I thought it was suspicious so we stopped, exited the vehicle. We approached to conduct a field interview." Officer Salgado called defendant over to the squad car. In response, the three men separated and "pretended like they didn't know each other." The men began to walk away. In turn, Officer Salgado called to defendant again in a louder voice, asking him to approach the vehicle. As Salgado began to walk toward the three men, they complied with the request and approached the officers. Initially, he asked what they were doing but received no response because "they were arguing that they didn't know each other." The men were then taken to Officer Salgado's vehicle, where Salgado "detained" them up against the vehicle as his partner checked the contents of the garbage can. Salgado testified that he did not have a warrant for defendant's arrest and did not see him violating any laws.

Upon inspection of the garbage can, Officer Otero discovered clothing, with retail tags affixed. The officers called for assistance and were joined by Sergeant Graff. After being apprised of the situation, the sergeant recalled that a clothing store had recently opened nearby. Graff proceeded to that location and checked the premises. In doing so, he discovered a hole above the rear door of the store, suggesting a forced entry. Officers Salgado and Otero then conducted protective pat-downs of defendant and the other two men and transported them to the store, located approximately one block west at 1552 South Pulaski. The men were not free to leave while the officers investigated the source of the clothing. Thereafter, the owner of the store,

3

Charles Coleman, arrived on the scene. He identified the items recovered from the garbage can as clothing sold in his store. In turn, the men were placed under arrest, separated, and removed to the police station for processing.

On questioning by the trial court, the officer explained how he knew the rolling can belonged to the City: "It's a brown garbage can everybody has behind their house, the one that [has] the wheels with the brown lid, serial number with the City of Chicago written on it, property of." Moreover, it was consistent with the other cans in the area and those distributed by the Department of Streets and Sanitation. Although the can contained a serial number, the officers were unable to determine its precise origin. Additionally, efforts to contact Streets and Sanitation were unavailing.

After hearing argument, the trial court determined that given the circumstances, the officers were justified in stopping the men, "If for no other reason than community care-taking responsibility of the police. It's totally reasonable for them to stop and ask what was going on." Moreover, the court found the defendant and his associates lacked standing to contest the officer's inspection of the contents of the can. The judge reasoned, "People put things in garbage cans, relinquish their possession. Because they are going to the city and streets and sanitation [*sic*] and ultimately to the garbage dump, so it's reasonable for the police to stop and investigate." Furthermore, on discovering the items, which appeared brand new and still had the tags attached to them, the court found that the police acted reasonably in detaining the men "for a short period of time to determine whether a crime has been committed." Lastly, the court observed that probable cause to arrest existed once a link was established between the clothing in the can and

4

the forced entry to the store. Therefore, trial court denied the motion and the matter proceeded to a bench trial.

Officer Salgado's trial testimony mirrored what he had related on the motion to suppress. Additionally, Salgado acknowledged that his report did not indicate the men dispersed when the officers approached. According to Salgado, no burglary tools were recovered from defendant. The officers found more than 12 "new clothing items, shirts, jeans, shorts, plastic wrapping on some of the clothes with tags, retails tags on them." After noting the serial number on the can, they placed the clothing into their squad car. The can itself was left adjacent to the sidewalk on Harding because of the "maggots and other types of bugs" inside the receptacle.

Salgado further testified that the owner of A.C. Ballers, Mr. Coleman, was notified of the incident and came to the store. Salgado indicated that it appeared "somebody kicked the wood that was above the door." Prior to encountering defendant and the other two men, the officers had not received any calls regarding a burglary in progress. Likewise, when they arrived at A.C. Ballers, no alarm was sounding. According to Salgado, an evidence technician was called to the scene. However, he did not know whether any prints were, in fact, recovered.

Detective Kevin Carney, a 22 year veteran of the Chicago police department, testified that he was assigned to investigate the alleged burglary of the A.C. Ballers retail store. Carney, accompanied by his partners, Detectives Xanos and Lopez, interviewed defendant in a lockup at the 10th district police station. After being advised of his *Miranda* warnings and acknowledging his understanding, defendant chose to make a statement, which lasted 20 to 30 minutes. Carney had previously spoken to the other two men accused of the burglary.

5

Defendant did not sign a waiver of his *Miranda* rights and his statement was not memorialized by audiotape, videotape, court reporter, or handwritten statement. Detective Carney claimed he took notes during the conversation. When asked if those notes were given to the prosecutor, Carney explained, "What we do, we complete a file and the file is held in Area 4. And later the prosecutor would get that file." When he was shown a handwritten summary of defendant's statement, Carney denied that he prepared it. However, Carney stated, "Any notes I do would be on a general offense progress note. That report is put in a file, and that report is stayed [*sic*] or kept in Area 4." Defense counsel then asserted that no such notes were tendered in response to the motion for discovery. The trial court instructed the parties to resolve that matter before the next court date.

According to Carney, defendant claimed he did not enter the store. Defendant explained that Ellis forced open the hole above the door, which was previously covered by a board. Ellis and "Rockmore" entered the store while defendant waited outside. Defendant's associates grabbed clothing from inside the store and threw the items to defendant through the hole above the door. The men then put the clothes into the garbage can. They planned to sell the stolen merchandise for money. According to Detective Carney, the plan to rob the store was conceived earlier that evening when the group met near 16th and Komensky. Carney was aware that an evidence technician was sent to the scene. However, he and his partners did not request fingerprinting and he did not know whether the scene was processed.

Charles Coleman testified that he is the owner of A.C. Ballers clothing store. During the early morning hours of June 15, 2007, he received a call from the police. In turn, he went to his

store and inspected the premises. He noticed that someone had "knocked a hole through the wall" above the store's rear door. Inside the store, he observed the damage to the drywall above the door. When asked to view the clothing in the trunk of a police car, Coleman identified the items as belonging to his store. He further described where the items were located in his store before they were taken. While the store was equipped with a burglar alarm, it may have malfunctioned, as it did not work from time-to-time.

Following the close of the State's case, the judge inquired about resolving the discovery issue brought out during Detective Carney's testimony. According to the prosecutor, the detective contacted Area 4, but was unable to locate their case file. The prosecutor further stated that everything in the State's possession was tendered to the defense. In an effort to resolve the situation, the detective was brought back to the stand. On questioning by the trial judge, Detective Carney stated, "At the time I thought I did write - - I know I did write some GPR's. I thought I did write some GPR's regarding the interview." However, he had not seen them since that time. Consequently, the trial court ordered him to return to Area 4 and search for his notes. Following a continuance, the prosecutor informed the court that Detective Carney was unable to locate any additional notes. The State then rested.

Defendant's motion for directed finding was denied. Thereafter, the defense rested without offering any evidence. Following closing argument, defendant was found guilty of burglary. However, in the absence of proof of the value of merchandise, he was acquitted of the theft charge. Defendant was then sentenced to six years' imprisonment. He now appeals.

Defendant frames his claim of error concerning his motion to suppress as follows:

1-08-2607

> "Where the police stopped [defendant] without reasonable suspicion, and then immediately detained and searched him and his container without having fear of danger and without probable cause, the evidence obtained as a result of this action was illegal and should have been suppressed."

Defendant maintains the encounter was initiated solely based upon Officer Salgado's "vague statement that he thought the activity looked suspicious." Moreover, defendant contends the error was compounded by his detention and the subsequent search of the garbage can, without probable cause. According to defendant, the trash can was an object "in which he had a legitimate expectation of privacy."

We review rulings on motions to suppress in accordance with the two-part standard articulated in *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996), whereby findings of historical fact are viewed for clear error and we afford due weight to any inferences drawn therefrom by the trial court and the ultimate legal ruling concerning suppression is reviewed *de novo*. Great deference is afforded to factual findings which will not be reversed unless they are contrary to the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542, 857 N.E.2d 187, 195 (2006). "This deferential standard of review is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Jones*, 215 Ill. 2d 261, 268, 830 N.E.2d 541, 548 (2005). A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *People v. Beverly*, 364 Ill. App. 3d 361, 368, 845 N.E.2d 962, 969 (2006).

8

Nevertheless, we as a reviewing court are free to assess the facts along with the issues raised in order to draw conclusions when determining appropriate relief. *Luedemann*, 222 Ill. 2d at 542, 857 N.E.2d at 195.

In the present case, defendant concedes the facts as adduced at the hearing, where he states, "[Defendant] assumes the truth of the testimony of the State's witness, and only questions whether such testimony shows that the police complied with the Fourth Amendment." Consequently, our review is properly *de novo*. See *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663.

The fourth amendment to the United States Constitution (U.S. Const., amend. IV) and article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, §6) protect individuals from unreasonable searches and seizures. See *People v. Rosenberg*, 213 Ill. 2d 69, 77, 820 N.E.2d 440, 446 (2004). As our supreme court observed in *Jones*:

"The central requirement of the fourth amendment is reasonableness. [Citation.] The touchstone of a fourth amendment analysis 'is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." ' [Citation.] Indeed, the 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials, including law enforcement officers, to safeguard the privacy and security of individuals against arbitrary invasions. [Citation.] To enforce the fourth amendment requirement of reasonableness, the United States Supreme Court 'has interpreted the Amendment as establishing rules and presumptions designed to

control conduct of law enforcement officers that may significantly intrude upon privacy interests.' [Citation.] ***

*** When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.' [Citation.] Thus, the reasonableness of a particular law enforcement practice is judged by balancing its promotion of legitimate governmental interests against its intrusion on fourth amendment interests, *i.e.*, the individual's right to personal security free from arbitrary interference by law enforcement officers. [Citations.]"

*Jones*, 215 Ill. 2d at 268-69, 830 N.E.2d at 548-49.

It is well settled that the facts underlying a claim of reasonable suspicion need not rise to the level of probable cause and do not require an officer to actually witness a violation. *People v. Richardson*, 376 Ill. App. 3d 612, 625, 876 N.E.2d 303, 314 (2007). Yet, a "*Terry* investigative detention cannot be justified *** on the basis of 'unparticularized suspicion' or on a 'hunch.' " *People v. Gherna*, 203 Ill. 2d 165, 181, 784 N.E.2d 799, 808-09 (2003), quoting *Terry v. Ohio*, 392 U.S. 1, 27, 20 L. Ed. 2d 889, 909, 88 S. Ct. 1868, 1883 (1968). Notably, section 107-14 of the Code of Criminal Procedure of 1963 provides that: "A peace officer *** may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense ***." 725 ILCS 5/107-14 (West 2006).

Manifestly, every interaction between a private citizen and a police officer neither

constitutes nor results in a seizure. *Luedemann*, 222 Ill. 2d at 544, 857 N.E.2d at 196. Instead, "A person is seized when, by means of physical force or a show of authority, the person's freedom of movement is restrained." *People v. Cosby*, 231 Ill. 2d 262, 273, 898 N.E.2d 603, 611 (2008), citing *United States v. Mendenhall*, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980). Informed precedent has created a three-tiered structure for evaluating encounters between the police and private citizens, as follows:

> "(1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops,' which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Luedemann*, 222 Ill. 2d at 544, 857 N.E.2d at 196.

In the present case, defendant's argument is focused on the inception of the encounter between the police officers and defendant's triumverate. The trial court determined that the officers were justified in making the stop, at the very least, by their role as community care-takers. We perceive significantly greater justification than the trial judge allowed. In determining the reasonableness of the encounter we must assess the totality of the circumstances at the time of the event. Here, the interaction commenced around 2:30 a.m., as the officers observed three men walking down a residential street. Two of the three men were collaborating in the pulling of a wheeled City of Chicago garbage can down the sidewalk. The scene is one that would objectively give rise to a suspicion sufficient to meet the requirement of reasonableness. See 725 ILCS 5/107-14 (West 2006). Officer Salgado justified the decision to stop the men, in part, upon his

training. While the officer denied having observed any criminal activity, we are not bound by his analysis or determination. Rather, a review of the Chicago Municipal Code is instructive:

> "It shall be unlawful for any person other than a city refuse collector or a private scavenger licensed by the city, to remove, displace, uncover, or otherwise disturb, any refuse container or the contents thereof when placed on location, as provided for in Section 7--28--230." Chicago Municipal Code §7--28--280 (1990).

In the absence of any suggestion that defendant and his cohorts were "city refuse collectors" or "private scavenger[s] licensed by the city," the circumstances were manifestly sufficient to give rise to a reasonable suspicion given Officer Salgado's observations.

In reaching this conclusion, we reject defendant's attempt to characterize the circumstances, as they presented themselves to Salgado and Otero, as embracing "a very large category of presumably innocent travelers. Individuals often transport trash cans in the course of everyday activities." The innocence of the travelers is not the issue. This was not "trash day." Instead, the question is whether the circumstances gave rise to a reasonable suspicion sufficient to stop defendant his associates. We conclude that they did.

Defendant's contentions progress a step further in his assertion that the police officers, even if they had a reasonable suspicion to effect a stop, violated the fourth amendment by searching the receptacle in their possession. The question in this regard thus refines itself to whether defendant had a reasonable expectation of privacy as to the can or its contents. See *People v. Sutherland*, 223 Ill. 2d 187, 230, 860 N.E.2d 178, 210 (2006). We discern that defendant enjoyed no such expectation. The evidence, which was not controverted and the

12

truthfulness of which has been stipulated on appeal, clearly established that the can was the property of the City of Chicago. Section 7--28--210(a) of the Chicago Municipal Code provides:

"(a) Standard refuse container. The standard refuse container required by this chapter shall be a receptacle of impervious material and sturdy construction, with a tight fitting cover, and shall be provided by the department of streets and sanitation." Chicago Municipal Code §7--28--210(a) (1990).

Here, to be sure, absent any proof that defendant and his associates were in the business of garbage collection, it was unlawful for them to have moved the container from its location or staked any claim to its contents. See Chicago Municipal Code §7--28--280 (1990).

Defendant similarly claims the evidence seized in this case should have been suppressed as "fruit of the poisonous tree." Yet, this doctrine would have application only if there was an illegal search or seizure. Here, however, having concluded the initial encounter fell within permissible and constitutional boundaries on the part of the officers and that defendant had no standing to object to the search of the garbage can, we find this argument unavailing. Where there was no poison or taint injected into the encounter or the seizure, we fail to perceive how the evidence could be so characterized. Consequently, we find this argument to be of dubious merit.

Having carefully considered the record in this case, we find the trial court did not err in its ruling denying defendant's motion to suppress. The facts and circumstances surrounding the officers' initial observations gave rise to entirely reasonable concerns, entitling them initially to approach and then stop the three men. Moreover, the subsequent discovery of the clothing inside the garbage can, coupled with the investigation at A.C. Ballers, escalated the encounter to the

level of probable cause supporting a full custodial arrest. Furthermore, evidence lawfully seized by the officers was not subject to suppression inasmuch as none of the men were entitled to any reasonable expectation of privacy in the contents of the receptacle in their possession. Therefore, the trial court did not err in denying the motion to suppress and the evidence recovered was properly admitted at trial.

Next, defendant maintains the evidence was insufficient to prove him guilty of burglary. Defendant contends:

"[T]he State relied on two faulty pieces of evidence: (1) the presumption that [defendant] committed the burglary because he and two other men were pulling a garbage can that contained articles of clothing from the store; and (2) the testimony of Detective Carney that [defendant] told him that he participated in the burglary."

Accordingly, defendant asserts his acts do not prove the burglary and that Carney's testimony was unworthy of belief.

When considering a challenge to the sufficiency of the evidence, courts of review must consider whether, when viewing all the evidence adduced at trial in a light most favorable to the State, any rational trier of fact could find proof of the essential elements of the charged offense beyond a reasonable doubt. *People v. De Filippo*, 235 Ill. 2d 377, 384-85, 919 N.E.2d 921, 925 (2009). Our task is not to retry defendant. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228, 920 N.E.2d 233, 242-43 (2009). "Rather, in a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *Siguenza-Brito*, 235 Ill. 2d at

1-08-2607

228, 920 N.E.2d at 243.  We will not reverse a conviction on the basis of contradictory evidence or a defendant's claim that a witness is not credible.  *Siguenza-Brito*, 235 Ill. 2d at 228, 920 N.E.2d at 243.

In order to establish the offense of burglary, the State must prove the defendant: "without authority *** knowingly enters or without authority remains within a building *** or any part thereof, with intent to commit therein a felony or theft."  720 ILCS 5/19-1(a) (West 2006).  In the case *sub judice*, the State established that defendant did not have authority to enter or remain in the A.C. Ballers clothing store through the testimony of the store's owner, Charles Coleman.  The State proved the entry into the store by virtue of the investigation of the premises coupled with the testimony of Coleman.  The uncontroverted testimony of Detective Carney revealed that defendant admitted the entry into the store by his associates, which was sufficient to establish, at the very least, his accountability for that element of the offense.  See 720 ILCS 5/5-1 (West 2006) ("A person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself, or that of another and he is legally accountable for such conduct as provided in section 5-2, or both"); 720 ILCS 5/5-2(c)(West 2006) ("A person is legally accountable for the conduct of another when: *** (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense").  Furthermore, defendant explained to Carney how he stood outside and received the merchandise as it was handed out of the store.  Indeed, this evidence provides proof of the requisite intent to commit a felony or theft within the store, as well as defendant's participation in

15

the crime. That the court found defendant not guilty of the theft count does not alter our analysis where all that is necessary to commit the offense of burglary is an intent to commit the offense and not the actual completion of the predicate offense. See 720 ILCS 5/19-1(a) (West 2006)

In sum, the evidence gathered by the police from the scene of the initial stop, the store, and the interview with defendant was compelling. The absence of notes from defendant's statement, while troublesome, is certainly subject to innocent explanation. Likewise, Carney's inability to recall facts of the case over a year later does not compel a finding that his testimony was incredible. Given defendant's manner and mode of flight from the crime scene, the circumstances of this case are rather unique. Therefore, it is within the realm of human reason that an experienced police officer might remember particular facts about the case well beyond the end of the day. Regardless, there was no evidence presented to contradict any of the State's evidence. Despite any infirmities, real or imagined, in the State's case, we find the evidence was sufficient to establish the elements of the offense of burglary when viewed in a light most favorable to the prosecution. There was ample proof and available inferences to sustain the trial court's finding of guilt.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

FITZGERALD SMITH and LAVIN, JJ., concur.