NOTICE
Decision filed 12/30/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230216-U

NO. 5-23-0216

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cumberland County. |
| | ) | |
| v. | ) | No. 21-DT-8 |
| | ) | |
| SARA D. ORDNER, | ) | Honorable |
| | ) | Jonathan T. Braden, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BOLLINGER* delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction, where (1) Lorazepam qualifies as an intoxicating compound under 625 ILCS 5/11-501(a)(3) (West 2020), (2) the evidence was sufficient to show that defendant was incapable of safely driving and (3) the evidence was sufficient to show that defendant was in actual physical control of a vehicle.

¶ 2    Following a bench trial in the Circuit Court of Cumberland County, defendant, Sara D. Ordner, was found guilty of driving under the influence of an intoxicating compound pursuant to section 11-501(a)(3) of the Illinois Vehicle Code (625 ILCS 5/11-501(a)(3) (West 2020)). Defendant raises three issues on appeal. Defendant asserts that the State (1) failed to prove beyond a reasonable doubt that she was under the influence of an intoxicating compound, as Lorazepam

_____

*Justice Sholar was originally assigned to the panel. Justice Bollinger was later substituted on the panel and has listened to oral arguments and read the briefs.

1

does not qualify as an intoxicating compound under section 11-501(a)(3); (2) failed to prove beyond a reasonable doubt that she was rendered incapable of safely driving as a result of the Lorazepam, as opposed to a narcoleptic episode; and (3) failed to prove that she was in actual physical control of a motor vehicle. For the following reasons, we affirm the conviction.

¶ 3                                    I. BACKGROUND

¶ 4     On March 10, 2021, defendant, Sara D. Ordner, received a traffic citation for driving under the influence (DUI) pursuant to section 11-501(a)(3) of the Vehicle Code. Subsequently, a confirmation of statutory summary suspension was filed indicating that defendant's driving privileges were suspended for 12 months for her failure to submit to chemical testing.

¶ 5     On March 7, 2022, defendant waived her right to a jury trial. The matter was eventually set for bench trial on September 22, 2022. On that bench trial date, defendant filed a motion to suppress, arguing that Deputy Steven Carr subjected her to custodial interrogation during the March 10, 2022, traffic stop without advising her of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and requested that the statements made pursuant to that alleged interrogation be suppressed. Both counsels agreed that the motion could be heard with the bench trial, so the trial court did not take up the motion separately.

¶ 6     The matter then proceeded to a bench trial. Deputy Carr testified first on behalf of the State. He stated that over his 20 years in law enforcement, he has conducted over 200 DUI investigations. He further indicated that his training encompassed DUI courses taken at the police academy in 2000, as well as subsequent on-the-job experience.

¶ 7     Deputy Carr testified that on March 10, 2021, shortly before 9 p.m., he responded to a report of a suspicious vehicle on Cumberland Road in Jewett, Illinois. Upon arrival, he spoke with Larry Lacey and Jeannie Kemper, the individuals who called and made the report. They directed

him to a 2011 Hyundai positioned on the shoulder of the road, facing the incorrect direction with its lights illuminated. Deputy Carr observed a female, subsequently identified as defendant, slumped over in the driver's seat, unconscious. He initially knocked on the window, then opened the door, and called to her to wake her. He used his flashlight to try to rouse her. Deputy Carr testified that defendant was the sole occupant of the vehicle, with the keys in the ignition and the engine running. He indicated that waking her was challenging and required some effort. Once awake, defendant appeared highly confused. When questioned about her activity, she stated that she had ingested half of a Lorazepam pill. When asked if she knew her whereabouts, she responded that she was in Neoga. Deputy Carr testified that they were approximately 20 miles from Neoga. He stated that, based on his training, education, and experience, he knew Lorazepam was a depressant.

¶ 8       The State requested that the trial court take judicial notice of Lorazepam's status as a controlled substance and depressant, stating, "Lorazepam is a Schedule 4 controlled substance; and I cite 720 ILCS 570/210, Subsection 3, Sub-subsection (13). And that under 720 ILCS 570/102, Subsection (m), it is described as a depressant that causes overall depression of central nervous functions and causes impaired consciousness and awareness." Defense counsel indicated that he had no objection to the trial court taking judicial notice that Lorazepam was listed in the Controlled Substances Act as a controlled substance but objected to the remainder. When asked for clarification by the trial court, defense counsel stated, "Well, Lorazepam is listed as a, on a laundry list of standard substances. The symptoms or the effects of the drug or the dosages or the amounts or none of that stuff are mentioned in the statute. Just lists it. So, yeah, is Lorazepam a controlled substance? We stipulate." Based on this, the trial court stated that it would take judicial notice "of the statutory citations from the State."

3

¶ 9    Deputy Carr further testified that defendant never provided him with a prescription for Lorazepam. He stated that during their interaction, he requested her license, which she struggled to find in her purse. Deputy Carr ultimately did find her license in her purse and testified it was not difficult to locate. He observed that, in addition to appearing confused, she exhibited slurred speech. He also noted that there was no smell of alcohol.

¶ 10    Deputy Carr requested that defendant exit the vehicle, after which he conducted a series of field sobriety tests. He testified that he demonstrated the one-leg stand test, and defendant attempted to perform it. She raised one knee, then the other, before ceasing the test. Deputy Carr stated that these actions indicated signs of impairment.

¶ 11    Deputy Carr testified that defendant experienced difficulty with the walk and turn test, initially stepping on her own foot, and subsequently failing to maintain heel-to-toe contact with each step. He stated that he did not recall her performance on the turn portion of the test. Deputy Carr further indicated that both stepping on her own foot and missing the heel-to-toe alignment were indicative of impairment.

¶ 12    Deputy Carr testified that he arrested defendant for DUI and placed her in the back of Deputy Easton's squad car. He further stated that he searched defendant's vehicle and found a pill bottle without a name or label in her purse, which contained 13 Concerta pills. Deputy Carr explained that Concerta is a stimulant and a controlled substance.

¶ 13    The State subsequently requested the trial court to take judicial notice of section 206(d)(f) of the Illinois Controlled Substances Act (720 ILCS 570/206(d)(f) (West 2020)), indicating that Concerta was the brand name for methylphenidate, a Schedule 2 Controlled Substance under that statute. Defendant did not object. Furthermore, the State requested the trial court take judicial notice of section 102(rr-5) of the Controlled Substances Act (*id.* § 102(rr-5)), which defines

4

methylphenidate "as a stimulant that causes an overall excitation of the central nervous system functions and causes impaired consciousness and awareness." Defendant again did not object.

¶ 14    Deputy Carr identified the pill bottle he discovered, which was subsequently admitted into evidence. Deputy Carr testified that he followed Deputy Easton back to the police station, where he, as required by section 11-501.1(c) of the Vehicle Code (625 ILCS 5/11-501.1(c) (West 2020)), read the Warning to Motorist to defendant. After reading the warning, he requested that defendant submit to a urine sample, however, she refused to do so.

¶ 15    During cross-examination, when asked specifically whether he remembered if the keys to the vehicle were in the ignition, Deputy Carr stated, "if it had keys that go in the ignition, it had keys in the ignition because the car was running, the lights were on as to why it drew attention in town." He testified that upon approaching the vehicle, he observed defendant slouched over the steering wheel. Furthermore, he stated that he did not administer *Miranda* warnings to defendant. Additionally, he indicated that he did not detect the smell of gasoline, methyl alcohol, rubbing alcohol, or any other chemical odors on defendant's breath. This concluded the evidence presented by the State.

¶ 16    Defense counsel then provided argument in support of the motion to suppress. Defense counsel requested that the statements defendant made following Deputy Carr's execution of his community caretaking function—specifically, checking on defendant's well-being—be excluded. The trial court reserved ruling on this motion.

¶ 17    Defense counsel then made a motion for a directed verdict, which was similarly taken under advisement by the trial court. In that motion, defense counsel argued that the State had presented no evidence that defendant was under the influence of an intoxicating compound, as defined under

5

the Use of Intoxicating Compounds Act (Intoxicating Compounds Act) (720 ILCS 690/1 *et seq.* (West 2020))

¶ 18    Don Ordner, defendant's father, testified on behalf of defendant. He stated that he had been in defendant's vehicle and that it did not utilize a traditional key, but rather a key fob that must be present in the vehicle to enable it to start. During cross-examination, he confirmed that if the vehicle was operational, it would imply that it had been started using a key fob. Additionally, he clarified that once the vehicle is running, the key fob did not need to be inserted into any particular part of the vehicle.

¶ 19    Jeannie Kemper testified next. She testified that on March 10, 2020, she contacted the police shortly before 9 p.m. regarding a woman who appeared to be passed out in a vehicle. She reported that she had gone to Larry Lacey's to purchase a soda when she made this observation. She stated that the vehicle was not running and that the lights were off.

¶ 20    During cross-examination, Kemper testified that she did not hear the engine of the vehicle operating. She approached the vehicle, looked inside, and defendant did not respond.

¶ 21    Defendant testified next. She stated that she had been at the location where her vehicle was discovered for approximately four hours. She indicated that her co-worker, Cami Deckard, drove her car to that location, however, Deckard had already departed by the time the police arrived. Defendant explained that her key fob was "dead" and that, for a person to start the vehicle, they would have to remove the key from the fob, place the fob inside the central console, press it in, apply pressure to the brake, and then press the ignition button. She stated that her vehicle was not running when the police arrived. Defendant further testified that Deckard took the key fob because she did not want defendant to drive the vehicle when she awoke. Defendant stated that when she

retrieved her vehicle from the tow yard, she was unable to operate it because she did not have the key fob and had to request that Deckard bring the key fob to her.

¶ 22     Defendant testified that she did not recall whether she informed Deputy Carr that she had taken half of a Lorazepam. She indicated that she possessed a prescription for Lorazepam, which is used for the treatment of anxiety. She further stated that the Concerta pills are prescribed for narcolepsy. Defendant testified that she had been diagnosed with narcolepsy, which was why she carried the medication in her purse. She also stated that her symptoms of narcolepsy include extreme fatigue and episodes of falling asleep.

¶ 23     During cross-examination, defendant reaffirmed that Deckard transported her to Larry Lacey's place in Jewett, and subsequently left her there, asleep. She stated that she felt disoriented before Deckard departed. She testified that her vehicle was already present at the location because she had attended a meeting earlier in Neoga, and she and Deckard had met in Jewett before she left her car there, with Deckard driving them both to the meeting in her own vehicle. Defendant testified that she was unable to determine the duration of a narcoleptic episode. She also admitted that Deckard was not available to testify and indicated that she was unaware of the need for Deckard's testimony.

¶ 24     Defendant acknowledged that she ingested half a tablet of Lorazepam on the day in question, with her usual dosage being two tablets per day. She testified that she did not consume two tablets on that day because she did not require them. Furthermore, she indicated that the bottle containing Concerta did not bear her name, as the original prescription bottle was at her residence, and she transferred some medication into another container for travel.

¶ 25     She testified that Lorazepam was the sole substance present in her system on the day in question. She stated that she declined to undergo a urine analysis "[d]ue to the fact that you could

7

say that anything was in my system." She also testified that she has always been advised against taking the test but does not recall who provided this advice. This concluded defendant's evidence.

¶ 26    The State recalled Deputy Carr as a rebuttal witness. He testified that defendant told him she pulled over because she was tired. Deputy Carr testified that defendant's vehicle was definitely running.

¶ 27    During cross-examination, Deputy Carr acknowledged that the fact that the vehicle was running constituted significant information but was not documented in his report. He stated that the headlights were illuminated, yet this detail was omitted from his report as well. Deputy Carr testified that it would be important to possess the keys or the means to operate the vehicle, noting that such information would be included in his towing report, which he did not have available at the time. He conceded that this particular detail was also absent from his police report.

¶ 28    During redirect examination, Deputy Carr testified that not every single detail is included in a police report. He stated that, although the method used to start the car could be considered an important detail, it would be irrelevant if the vehicle was already in operation. He explained that he omitted this point from his report because the car was running at the time. This concluded the evidence. After hearing the closing arguments, the trial court took the matter under advisement.

¶ 29    The trial court reconvened on October 3, 2022. The trial court initially addressed the motion to suppress, noting that it reviewed case law submitted by the State and concurred with the legal principles therein. It determined that pre-arrest roadside questioning during a routine traffic stop does not require a *Miranda* warning, as the individual is not subject to custodial interrogation. Consequently, the trial court denied defendant's motion to suppress.

¶ 30    The trial court next considered the motion for a directed verdict, referencing *People v. Rousso*, 2015 IL App (2d) 141128-U, where a defendant was charged with driving under the

8

influence of an intoxicating compound after "huffing" a can of duster containing Difluoroethane, commonly known as DFE. In that case, the defendant argued that DFE was not explicitly listed under the Intoxicating Compounds Act and was not encompassed by the general exception provided therein. The trial court observed that the present situation was distinguishable from *Rousso*, given that Lorazepam is a Schedule 4 controlled substance and also falls "under the purview of Subsection [(a)(3)] of the DUI statute related to the use of drugs or a combination of drugs." The trial court further elaborated:

"In *Rousso*, the defendant and the Court noted the defendant didn't argue that DFE is not intoxicating, in the general sense of the word, or that at the time of the accident she was intoxicated but not to a degree that she was incapable of driving safely. The arguments, the only argument was that DFE was not listed or eligible as a prohibited compound in the Intoxicating Compounds Act.

And that's similar to the argument being made before the Court that Lorazepam is not an intoxicating compound, not contained in the definition of the Intoxicating Compounds Act, and is a more appropriate charge under Subsection (a)(3).

But the Court in *Rousso* indicated that being a prohibited compound in the Intoxicating Compounds Act is not an element of the DUI based on Subsection (a)(3). So the Court rejected the argument as it related to DFE."

¶ 31 The trial court indicated that it reviewed Illinois Pattern Jury Instructions 4.25, which defines an intoxicating compound as "any substance ingested *** by a person for the purpose of inducing a condition of intoxication *** [or] depression," amongst others. The trial court stated, "[w]e would also include any substance ingested by a person which in any manner changes, distorts, disturbs the auditory, visual or mental processes." The trial court further indicated that it

9

needed to contrast this with the cardinal rule of statutory construction "which is to ascertain and give effect to the legislature's true intent." The trial court stated:

"Now these two passages are conflicting as it relates to what I believe is a novel, it's a novel issue presented to the Court. On the one hand, by allowing the State to proceed on a DUI based on Subsection (a)(3), intoxicating compounds, where the only evidence was presented was the ingestion of a drug, this would effectively negate Section (a)(4). There would be no reason for the legislature to have enacted that drug section if an intoxicating compound also applies to drugs.

The Court does believe that the nature of the statute is to criminalize driving with substances that render a person incapable of safely driving when those substances are not drugs or alcohol. It is further buttressed by the information that Counsel Hoffeditz provided where the Secretary of State indicates the intoxicating compounds and gives examples of paint sniffing and glue. These are, otherwise, legal substances that could create or could render a person incapable of safely driving.

The Court does believe that the idea of that subsection is to broaden the reach of the DUI statute. I have to balance this against, on the other land [*sic*], the language of the statute is unambiguous. Prohibiting the State from proceeding with reasoning exception to the statute that the legislature did not intend, that is that a controlled substance would be excluded as an intoxicating compound. And as everyone is aware, there is no Appellate case law that directly addresses this issue.

But, ultimately, based on the persuasive value of *Rousso*, which I believe was a First District case, or excuse me, Second District case, based on the persuasive value of *Rousso*, the Illinois Pattern Criminal Jury Instructions which was drafted by the Supreme

10

Court Committee on Jury Instructions, and the plain language related to the statute of intoxicating compounds, I do believe that the evidence presented considered in the light most favorable to the State would be sufficient to support a finding of guilty. So, consequently, the Motion for Directed verdict is denied."

¶ 32    The trial court then proceeded to the issues of the bench trial. It reiterated the testimony presented, noting "The Court did not find Ms. Ordner's testimony to be credible. I have serious doubts, in addition to her credibility, about the ability of Ms. Ordner to recall any of the details from the night of the stop." The trial court indicated that the State was required to establish two propositions. First, it had to prove beyond a reasonable doubt that defendant was operating her vehicle. The trial court relied on Deputy Carr's testimony, which stated that defendant had admitted to him that she had driven the car, and consequently, the trial court found that this proposition had been established by the State. The second proposition was that at the time defendant was operating the vehicle, she was under the influence of an intoxicating compound to a degree that rendered her incapable of driving safely. The trial court observed that defendant was in actual control of the vehicle, referencing Deputy Carr's testimony that the car was running. As a result, the trial court concluded that defendant was under the influence of an intoxicating compound to a degree which rendered her incapable of safely driving the vehicle and entered a judgment of conviction.

¶ 33    On November 3, 2022, defendant filed a motion to reconsider the denial of the motion for a directed verdict. She contended that the State failed to prove that she was under the influence of an intoxicating compound. She argued that the trial court's reliance on *Rousso* was in error, stating that it was an unpublished opinion. She contended that in order to give meaning to the DUI statute, all subsections must be read together to avoid one subsection from becoming superfluous.

11

¶ 34    The case was scheduled for a hearing concerning the motion to reconsider, as well as a sentencing hearing, on November 18, 2022. Following oral argument, the trial court took the matter under advisement and continued the sentencing hearing. On December 12, 2022, the parties reconvened, and the trial court denied the motion to reconsider. The case was then continued for a presentence investigation.

¶ 35    On March 7, 2023, the matter was scheduled for a sentencing hearing. Following arguments by counsel, the trial court imposed a sentence of 18 months' probation on defendant, along with the standard terms and conditions of such probation. On April 6, 2023, defendant filed a notice of appeal.

¶ 36                                    II. ANALYSIS

¶ 37    Defendant raises three issues on appeal. First, she contends that the State failed to prove beyond a reasonable doubt that she was under the influence of an intoxicating compound as Lorazepam does not qualify as an intoxicating compound under section 11-501(a)(3) of the Vehicle Code. Second, she argues that the State failed to prove beyond a reasonable doubt that she was rendered incapable of safely driving as a result of the Lorazepam, as opposed to her suffering from a narcoleptic episode. Finally, she asserts that the State failed to prove beyond a reasonable doubt that she was in actual physical control of a motor vehicle.

¶ 38                           A. Intoxicating Compound

¶ 39    Defendant was charged under section 11-501(a)(3), which states that "A person shall not drive or be in actual physical control of any vehicle within this State while *** under the influence of any intoxicating compound or combination of intoxicating compounds to a degree that renders the person incapable of driving safely." *Id*. "Intoxicating compound" is not explicitly defined within the Vehicle Code, and defendant argues that the term should be defined exclusively as used

12

in the "use prohibited" section of the Intoxicating Compounds Act (720 ILCS 690/1 (West 2020)) for an appropriate definition, which states:

> "No person shall ingest, breathe, inhale or drink any compound, liquid, or chemical containing toluol, hexane, trichloroethylene, acetone, toluene, ethyl acetate, methyl ethyl ketone, trichloroethane, isopropanol, methyl isobutyl ketone, methyl cellosolve acetate, cyclohexanone, the alkaloids atropine, hyoscyamine, or scopolamine, or any other substance for the purpose of inducing a condition of intoxication, stupefaction, depression, giddiness, paralysis or irrational behavior, or in any manner changing, distorting or disturbing the auditory, visual or mental processes. For the purposes of this Act, any such condition so induced shall be deemed to be an intoxicated condition." 720 ILCS 690/1 (West 2020).

Defendant asserts that, as Lorazepam is not explicitly named in the Intoxicating Compounds Act and does not bear similarity to the listed drugs, Lorazepam does not constitute an intoxicating compound within the context of section 11-501(a)(3) of the Vehicle Code. Consequently, she contends that she is not guilty of being under the influence of an intoxicating compound.

¶ 40 "The primary rule of statutory construction is to give effect to the intent of the legislature. The most reliable indicator of legislative intent is the statutory language itself, which must be given its plain and ordinary meaning." *In re Parentage of J.W.*, 2017 IL App (2d) 160554, ¶ 23. Matters pertaining to statutory construction are reviewed *de novo*. *Keating v. 68th and Paxton, L.L.C.*, 401 Ill. App. 3d 456, 463 (2010).

¶ 41 We first address defendant's argument by assuming *arguendo* that defendant is correct in her assertion that the Intoxicating Compounds Act was intended to serve as the sole definition for "intoxicating compound" in section 11-501(a)(3) of the Vehicle Code. In so assuming, it is

13

noteworthy that the Intoxicating Compound Act's list of non-permitted compounds includes, after enumerating multiple specifics, "any other substance for the purpose of inducing a condition of intoxication, stupefaction, depression, giddiness, paralysis or irrational behavior, or in any manner changing, distorting or disturbing the auditory, visual or mental processes." 720 ILCS 690/1 (West 2020). This catchall phrase significantly broadens the spectrum of intoxicating substances within the Intoxicating Compounds Act and unquestionably encompasses any and all substances that result in intoxication. The pertinent question, then, is whether Lorazepam qualifies as such a compound. We conclude that it does.

¶ 42     Lorazepam is listed under section 201(c)(13) of the Controlled Substances Act (720 ILCS 570/201(c)(13) (West 2020)), as a controlled substance "associated with a depressant effect on the central nervous system." A depressant is defined under section 102(m) of the Controlled Substances Act (720 ILCS 570/102(m) (West 2020)) as any drug that "causes an overall depression of central nervous system functions [and] *** causes impaired consciousness and awareness." The fact that the statute defines it as a depressant alone places Lorazepam within the Intoxicating Compounds Act's catchall phrase, as that certainly means that it is a substance with the purpose of "inducing a condition of *** depression." That Lorazepam, as a depressant, is further defined by statute as causing "impaired consciousness and awareness" only further cements its inclusion within the Intoxicating Compounds Act's catchall clause. See 720 ILCS 690/1 (West 2020). "Impaired consciousness and awareness" certainly qualify as "in any manner changing, distorting or disturbing *** mental processes." Based on a plain reading of the relevant statutes alone, it is clear that Lorazepam is an intoxicating compound as defined by the catchall clause of the Intoxicating Compounds Act.

¶ 43    Furthermore, while it is clear based on this analysis that Lorazepam is clearly an "intoxicating compound" as defined by the Intoxicating Compounds Act, we also disagree, for several reasons, with defendant's assertion that the sole definition of "intoxicating compound" for the purposes of section 11-501(a)(3) of the Vehicle Code is confined to the definition for "intoxicating compound" under the Intoxicating Compounds Act. First, section 11-501(a)(6) of the Vehicle Code (625 ILCS 5/11-501(a)(6) (West 2020)) specifies that an individual shall not operate or be in physical control of a vehicle if there is any amount of a drug or compound resulting from the unlawful use of a controlled substance enumerated in the Intoxicating Compounds Act, in their breath, blood, urine or other bodily substance. Specifically, that subsection states in part:

> "[a] person shall not drive or be in actual physical control of any vehicle within this State while:
>
> * * *
>
> there is any amount of a drug, substance, or compound in the person's breath, blood, other bodily substance, or urine resulting from the unlawful use or consumption of a controlled substance listed in the Illinois Controlled Substances Act, an intoxicating compound listed in the Use of Intoxicating Compounds Act, or methamphetamine as listed in the Methamphetamine Control and Community Protection Act." *Id.*

The specific inclusion of the Intoxicating Compounds Act in section 11-501(a)(6) of the Vehicle Code contradicts defendant's argument that the Intoxicating Compounds Act's list of compounds is the only list attributable to a violation of section 11-501(a)(3). Clearly if the legislature had wished to reference the Intoxicating Compounds Act to define "intoxicating compound," it would have done so there, as it explicitly references the statute in section 11-501(a)(6).

15

¶ 44   Second, section 11-501(a)(4) of the Vehicle Code (625 ILCS 5/11-501(a)(4) (West 2020)) further supports that the compounds referred to in section 11-501(a)(3) are not restricted to those enumerated in the Intoxicating Compounds Act. Section 11-501(a)(4) requires that an individual shall not drive or be in actual physical control of a vehicle while "under the influence of any other *drug* or combination of *drugs* to a degree that renders the person incapable of safely driving." (Emphases added.) *Id.* This subsection bears significant similarity to section 11-501(a)(3), with the exception of the substitution of "drugs" in subsection (a)(4) for "intoxicating compound" in subsection (a)(3). Defendant contends that not limiting "intoxicating compounds" in section 11-501(a)(3) to those listed in the Intoxicating Compounds Act renders section 11-501(a)(4) superfluous. We disagree.

¶ 45   As noted, section 11-501(a)(4) is virtually identical to section 11-501(a)(3), differing only in that it requires the person be under the influence of a "drug" rather than an "intoxicating compound." Numerous drugs on the market, including pain relievers and heart medications, are not classified as "intoxicating compounds." Consequently, such drugs do not satisfy the criteria of subsection (a)(3). Nonetheless, over-ingestion of these medications could impair an individual's ability to drive safely and therefore fall within the scope of subsection (a)(4), but not within the scope of subsection (a)(3). In essence, subsection (a)(4) is not rendered superfluous by the absence of the limitation to the Intoxicating Compounds Act-listed compounds for subsection (a)(3). Rather, it creates a new charge separate from subsection (a)(3) by encompassing compounds that are not technically intoxicating and thus not covered under subsection (a)(3).

¶ 46   Furthermore, while there are no jury instructions for section 11-501(a)(3) standing alone, there are jury instructions for aggravated driving under the influence based on section 11-501(a)(3), including an "issues" instruction, Illinois Pattern Jury Instructions, Criminal, No.

16

23.70B (approved December 8, 2011) (hereinafter IPI Criminal No. 23.70B), which specifies that to prove the charge of aggravated driving under the influence of intoxicating compound where there was an accident resulting in bodily harm to a child under the age of 16 under the combined authority of sections 11-501(a)(3) and 11-501(d)(1)(J) of the Vehicle Code (625 ILCS 5/11-501(a)(3), (d)(1)(J) (West 2020)), the State is not required to prove a particular intoxicating compound. The instruction specifies that the State must prove, "That at the time the defendant [(drove) (was in actual physical control of)] a vehicle, the defendant was under the influence of [(any intoxicating compound) (a combination of intoxicating compounds)] to a degree which rendered the defendant incapable of safely driving." IPI Criminal No. 23.70B. Notably, there are no openings or alternatives after the bracketed choice for "any intoxicating compound" or "a combination of intoxicating compounds" requiring that a specific intoxicating compound or combination of intoxicating compounds be proven. Instead, the State is only required to prove defendant was under the influence "of any intoxicating compound" or "combination of intoxicating compounds" without specificity. The "issues" jury instructions in a criminal case specify element by element, or, in the language of the instructions themselves, "proposition" by "proposition" *exactly* what the State must prove to sustain its charges, with each of the "issues" instructions, including IPI Criminal No. 23.70B, specifying,

"If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." IPI Criminal No. 23.70B.

17

As a result, it is clear that the State need prove no more than what is specified in the relevant "issues" instruction to sustain a particular charge. As the aggravated form of driving under the influence of an intoxicating compound under subsection (a)(3), as demonstrated by IPI Criminal No. 23.70B, does not require specifying a particular intoxicating compound, so too does the base level offense not require such proof. The State bears only the burden of proving that defendant was under the influence of an intoxicating compound that rendered her incapable of operating a vehicle safely, rather than proving that she was under the influence of a specific intoxicating compound. In essence, the State was not required to establish that defendant ingested Lorazepam, just that defendant consumed an intoxicating compound which resulted in her being unable to drive safely. It is clear, then, based on this and the previous arguments, that, in contrast to defendant's assertion, the Intoxicating Compounds Act was not intended to serve as the sole and exclusive definition of an intoxicating compound under section 11-501(a)(3) of the Vehicle Code.

¶ 47                                   B. Sufficiency of evidence

¶ 48     Defendant raises two separate issues regarding the sufficiency of the evidence. First defendant claims that the evidence was insufficient to show that she was incapable of safely driving. Second, she claims that the evidence was insufficient to show that she was in actual physical control of a vehicle.

¶ 49     "When considering a challenge to the sufficiency of the evidence, courts of review must consider whether, when viewing all the evidence adduced at trial in a light most favorable to the State, any rational trier of fact could find proof of the essential elements of the charged offense beyond a reasonable doubt." *People v. Edward*, 402 Ill. App. 3d 555, 571 (2010). Our role is not to retry a defendant. *Id.* " 'Rather, in a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences

18

therefrom, and to resolve any conflicts in the evidence.' " *Id.* (quoting *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009)). We will not overturn defendant's conviction based on contradictory evidence or claims regarding the credibility of witnesses. *Id.* at 572. " 'A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt.' " *People v. Galarza*, 2023 IL 127678, ¶ 26 (quoting *People v. Belknap*, 2014 IL 117094, ¶ 67).

¶ 50                                    1. Incapable of Safely Driving

¶ 51    Defendant contends that the evidence was insufficient to establish that she was incapable of safely driving after taking half a pill of Lorazepam. We initially point out a flaw in defendant's assertion: that the State was required to prove that only one-half of a pill caused her stupefied state. To the contrary, the State is not obligated to demonstrate the quantity of substances consumed by defendant, but that she consumed any amount of a substance that rendered her incapable of driving safely. For example, in a DUI charge pursuant to section 11-501(a)(2) of the Vehicle Code, which forbids the consumption of alcohol to the extent of rendering the individual unable to drive safely, the language for that prohibition mirrors that of section 11-501(a)(3), under which this defendant was charged. Under subsection (a)(2), the State is not required to prove the precise amount of alcohol ingested by a defendant. Instead, "the State's burden was to prove that defendant's impaired condition resulted from drinking *any* amount of alcohol." (Emphasis added.) *People v. McConnell*, 2021 IL App (1st) 191694-U, ¶ 22. Thus, in the present case, the State was not required to establish the specific quantity of substance(s) defendant consumed to reach her level of impairment. Rather, the State must instead demonstrate that she ingested *any* substance that caused intoxication to the extent that it rendered her incapable of driving safely. The fact that the State need not prove the quantity of the substance consumed is especially relevant, where, as here, a

19

defendant refuses chemical testing, thus effectively foreclosing the State's ability to meet such a burden. A defendant cannot be allowed to render the State categorically unable to prove an element of an offense with a simple refusal.

¶ 52    We acknowledge that it is lawful in Illinois to take medications pursuant to a valid medical prescription. "That does not mean, however, that simply because someone has a medical prescription for a controlled substance he or she can always operate a motor vehicle safely while taking that medication." *People v. Rodriguez*, 398 Ill. App. 3d 436, 444-45 (2009). Such is the case here.

¶ 53    The State bore the burden of demonstrating that defendant was incapable of operating a vehicle due to the influence of the substance(s) she ingested. The State accomplished this through the use of circumstantial evidence. A defendant may be convicted of a DUI based on circumstantial evidence. *People v. Hostetter*, 384 Ill. App. 3d 700, 712 (2008). Indeed, "[c]ircumstantial evidence alone may suffice to prove a defendant guilty of DUI." *People v. Morris*, 2014 IL App (1st) 130512, ¶ 20. "Circumstantial evidence is proof of certain facts and circumstances from which the fact finder may infer other connected facts which usually and reasonably follow from the human experience and is not limited to facts that may reasonably have alternative, innocent explanations." *People v. Diaz*, 377 Ill. App. 3d 339, 345 (2007). The circumstantial evidence presented by the State in this case overwhelmingly supported a finding that defendant was guilty beyond a reasonable doubt of violating section 11-501(a)(3).

¶ 54    First, defendant declined to undergo a urine test. Section 11–501.2(c) of the Vehicle Code (625 ILCS 5/11-501.2(c) (West 2020)) provides that evidence of a refusal to submit to a chemical test shall be admissible during a DUI trial. This reflects a legislative determination that such evidence is relevant. Specifically, the legislature has concluded that a driver's refusal to comply

20

with a chemical test serves as circumstantial evidence of her consciousness of guilt. *People v. Garriott*, 253 Ill. App. 3d 1048, 1052 (1993). A driver's refusal to undergo testing exposes a defendant to an inference regarding her state of mind concerning the probable results of the test. *Id.* The fact-finder may reasonably deduce that a defendant refused because she anticipated the test would confirm impairment. *Id.* Such evidence is probative to the issue of intoxication. *Id.* Consequently, a driver's refusal is deemed relevant as it implies a belief of intoxication, an assertion that the driver is well-positioned to assess. *Id.*

¶ 55    This same analysis applies in the present case. Defendant's refusal to undergo a urine test suggests an awareness that she would test positive for certain substances. The trial court noted this in issuing its ruling, stating, "And further she refused to admit, submit to urine testing which is indicative of a consciousness of guilt." The trial court appropriately inferred that defendant was aware of her guilt.

¶ 56    Second, the other facts presented at trial were more than sufficient by themselves to support defendant's conviction. Deputy Carr testified that defendant was discovered slumped over and asleep in a running vehicle facing the incorrect direction. Upon being awoken by Deputy Carr, defendant exhibited signs of intoxication, including slurred speech, significant confusion, including believing that she was 20 miles away from her actual location, and an inability to locate her driver's license, which was easily found in her purse by Deputy Carr. Furthermore, defendant admitted to having taken Lorazepam and was also found in possession of numerous other pills in an unmarked bottle. She failed all field sobriety tests administered by Deputy Carr. These facts alone are sufficient, even without the inference of guilt established by her refusal of chemical testing, to show defendant was impaired to the point that she was incapable of safely driving.

21

¶ 57　Third, the trial court found the credibility of defendant to be significantly lacking. "We afford great deference to the circuit court's assessment of a witness's credibility because 'the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Parker*, 2016 IL App (1st) 141597, ¶ 29 (quoting *People v. Richardson*, 234 Ill. 2d 233, 251 (2009)). There is no reason in this case to naysay the trial court's findings regarding defendant's credibility and we therefore defer to its judgment.

¶ 58　Fourth, as previously stated, defendant acknowledged the ingestion of Lorazepam. Additionally, Concerta, another medication requiring a prescription, was discovered in her possession in an unmarked bottle. By agreement with defense counsel, the trial court took judicial notice that Lorazepam is a controlled substance. Defense counsel also stipulated that Concerta is a controlled substance and a stimulant that "causes an overall excitation of the central nervous system functions and causes impaired consciousness and awareness" per section 102(rr-2) of the Controlled Substances Act (720 ILCS 570/102(rr-2) (West 2020)).

¶ 59　Both Lorazepam and Concerta, per statute, induce impairment of consciousness and awareness. Legal precedent indicates that the State is not invariably required to produce expert opinion testimony or scientific evidence demonstrating intoxication to establish the effects of a drug on an individual's ability to operate a vehicle, when considering the totality of the evidence. See *People v. Gocmen*, 2018 IL 122388, ¶ 41; *People v. Morris*, 2014 IL App (1st) 130152, ¶ 22 (citing *People v. Gordon*, 378 Ill. App. 3d 626, 632 (2007)); *People v. Lenz*, 2019 IL App (2d) 180124, ¶ 121. In this case, defendant stipulated to the effects of both substances found in her vehicle and acknowledged taking at least one of them. The cumulative evidence presented at trial,

including the stipulated effects of Lorazepam and Concerta, was sufficient to sustain a guilty verdict beyond a reasonable doubt.

¶ 60    Defendant asserts that Deputy Carr lacked the experience to identify individuals under the influence of Lorazepam, and consequently, did not demonstrate the requisite level of expertise to support defendant's guilt. However, *Gocmen*, 2018 IL 122388, rejects the idea that an officer must always be qualified as an expert in order to testify regarding a defendant's drug intoxication. In *Gocmen*, the defendant was charged with DUI due to being under the influence of alcohol or drugs under section 11-501(a)(4). *Id*. The defendant was found behind the wheel of a running vehicle. *Id.* ¶ 41. The issue was whether the defendant was impaired due to a medical emergency, ingestion of drugs or alcohol, or a combination of those factors. *Id.* The Court noted that the appellate court was concerned about the officer's inability to differentiate between symptoms of diabetes and drug use. *Id.* ¶ 56. However, the court stated that "[w]e do not expect police officers in the field to make differential diagnoses—only to determine based on the totality of the circumstances whether an impaired driver is under the influence of alcohol or drugs, even if he or she may also have a medical condition." *Id.* "Expert testimony is not required in every case for an officer to testify to his opinion that a motorist was under the influence of drugs based on his inference from the totality of the circumstances. When, as here, the totality of circumstances at the time of the arrest is sufficient to lead a reasonably cautious person to believe that an individual was driving under the influence of drugs, probable cause exists." *Id.* ¶ 62.

¶ 61    We observe that *Gocmen* is distinguishable from the present case, as it involved the trial court's order granting a petition to rescind summary suspension, rather than the trial court's judgment following a bench trial. However, it is of significant importance that the ruling in *Gocmen* directly contradicts the pre-*Gocmen* cases relied upon by defendant, which all held that

23

an arresting officer was not qualified to testify that a defendant was under the influence of a drug due to the officer's lack of qualifications in drug detection. For instance, defendant cites *People v. Workman*, 312 Ill. App. 3d 305 (2000) and *People v. Jacquith*, 129 Ill. App. 3d 107 (1984), for the proposition that a reversal is required because Deputy Carr did not have any training or experience in "identifying the behaviors of someone who appeared under the influence of any drug, let alone Lorazepam." However, both were decided before the Illinois Supreme Court's contradictory ruling in *Gocmen* and therefore do not influence our analysis.

¶ 62    Defendant also cites *People v. Trotter*, 2021 IL App (3d) 180726-U, which established that expert opinion testimony was necessary to demonstrate that Adderall impaired the defendant's ability to operate a vehicle. Consequently, the court found that there was insufficient evidence of a DUI where the State failed to correlate that defendant's impaired driving and performance on standardized field sobriety tests with Adderall consumption. *Id.* ¶ 39. However, we choose not to follow the holding in *Trotter*, as it failed to cite or consider the Illinois Supreme Court's contrary determination in *Gocmen*. When the Illinois Supreme Court " 'has declared the law on any point, *it alone can overrule and modify its previous opinion*, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases.' " (Emphasis in original.) *Yakich v. Aulds*, 2019 IL 123667, ¶ 13 (quoting *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 61).

¶ 63    Finally, defendant asserts that our previous decision in *People v. Vanzandt*, 287 Ill. App. 3d 836 (1997) supports her contention that there was insufficient evidence to establish impairment. In *Vanzandt*, the defendant contended that the State did not prove beyond a reasonable doubt that he was guilty of driving under the influence of alcohol and drugs. *Id.* at 844-45. Specifically, the defendant argued that the sole evidence regarding drug presence was his own testimony, stating

24

he was diabetic and had administered insulin the previous evening. *Id.* He claimed that his seemingly intoxicated behavior was attributable to a hypoglycemic attack. *Id.* Evidence showed that the defendant had taken insulin earlier that evening, however, he never admitted to being under its influence. *Id.* at 845. Furthermore, there was no evidence indicating that insulin, whether alone or combined with alcohol, would impair a person's ability to drive safely. *Id.* "Because the State has failed to produce any evidence that [the defendant] was under the combined influence of alcohol and insulin, the judgment of the circuit court of Perry County must be reversed." *Id.*

¶ 64 We find that the facts in *Vanzandt* are distinguishable from this case. Here, defendant admitted to having taken Lorazepam, a controlled substance with a legislatively acknowledged ability to "impair consciousness and awareness," not insulin, which has no similar applicable statute. There was no evidence presented in *Vanzandt* regarding how insulin could affect a person's ability to operate a motor vehicle whereas in this case, pursuant to statute and the parties' stipulation thereto, the trial court took judicial notice that (1) Lorazepam, as well as Concerta, which the defendant also possessed, are controlled substances; (2) Lorazepam is a depressant causing overall depression of the central nervous system functions; (3) Concerta was a stimulant causing an overall excitation of the central nervous system functions; and (4) that both Lorazepam and Concerta impair consciousness and awareness. These stipulations, and the statutes prompting them, place this defendant in circumstances entirely dissimilar to the defendant in *Vanzandt*, where no such stipulations were made. These stipulations alone distinguish this case from *Vanzandt*.

¶ 65 The circumstantial evidence in this case was sufficient to establish a finding of guilt. Deputy Carr provided testimony regarding his observations, which was deemed credible by the trial court. A conviction for driving while under the influence can be supported solely by the credible testimony of the arresting officer. *Gordon*, 378 Ill. App. 3d at 632. Furthermore, defendant

25

acknowledged consuming Lorazepam and was discovered with an unmarked bottle of Concerta. Both drugs impair consciousness and awareness. She declined to undergo a urine test, supporting defendant's consciousness of guilt, and she failed field sobriety tests. Her testimony at trial regarding how she came to be in a vehicle on the side of the road conflicted directly with her statements to Deputy Carr on the night in question. Defendant exhibited multiple signs of impairment, including slurred speech and significant confusion. For the reasons stated above, considering the evidence in the light most favorable to the State, we cannot conclude that the evidence was so unreasonable, improbable, or unsatisfactory as to establish a reasonable doubt regarding defendant's inability to drive as a result of ingesting an intoxicating compound.

¶ 66                              2. Actual Physical Control of Vehicle

¶ 67    Defendant's final argument is that the State did not establish that she was in actual physical control of the motor vehicle, a claim that the evidence of that element of the offense was insufficient. She argues that Deputy Carr's testimony regarding the condition of her vehicle conflicted with that of Kemper. She maintains that the "State's case hinged on Officer Carr's testimony" and questions his credibility and the trial court's reliance thereon.

¶ 68    As stated above, in determining whether there is sufficient evidence to prove an element of an offense beyond a reasonable doubt, it is not our role to retry a defendant and we will not overturn a conviction based on contradictory evidence or a claim that a witness is not credible. *Edward*, 402 Ill. App. 3d at 571. That is explicitly what defendant is asking us to do here, and we decline to do so.

¶ 69    In addition to proving that defendant was under the influence of an intoxicating substance that rendered her unable to safely drive, the State also had to prove that defendant was driving or in actual physical control of a vehicle. 625 ILCS 5/11-501(a)(3) (West 2020). We first note that

26

the trial court explicitly ruled that "Based on the testimony that Ms. Ordner admitted to Officer Carr to having driven the vehicle *** this Court does believe that the State has proven that Ms. Ordner drove that vehicle." As we decline to gainsay the trial court's determination that Deputy Carr was a credible witness in this case, this, along with the undisputed fact that defendant was found in the driver's seat of a vehicle, alone means that the State met its burden regarding defendant driving or being in actual physical control of a vehicle. However, even were we to disregard the trial court's determination that defendant had, in fact, driven her vehicle, defendant's argument would still fail.

¶ 70    "With respect to the actual physical control element, defendant need not drive to be in actual physical control of a vehicle, nor is her intent to put the vehicle in motion relevant to the determination." *People v. McAndrew*, 2024 IL App (1st) 230881, ¶ 46. "The issue of actual physical control is determined case-by-case, with consideration given to whether defendant (1) possessed the ignition key, (2) had the physical capability of starting the engine and moving the vehicle, (3) was sitting in the driver's seat, and (4) was alone with the doors locked." *Id.* These factors are merely a non-exhaustive guideline for determining actual physical control of a vehicle. *Id.* The absence of a single factor does not control. *Id.*

¶ 71    It is undisputed that defendant was alone in the vehicle, seated in the driver's seat, and slumped over the steering wheel. As such, the third and fourth of the non-exhaustive factors determining actual physical control of a vehicle are present. Instead, defendant challenges the existence of the other two factors, primarily the second, whether defendant "had the physical capability of starting the engine and moving the vehicle" by citing the conflicting testimony regarding whether her vehicle was operational.

27

¶ 72   Deputy Carr testified that the vehicle was running when he approached, whereas Kemper, the individual who initially discovered defendant, stated that it was not. The trial court recognized this inconsistency and remarked:

> "The Court did hear conflicting testimony. Jeanne Kemper testified that the car was not running. Her testimony that she was near the window of the car. She did not hear the engine running. However, her testimony is also that she was concerned, focused on the woman passed out in the car. And as soon as she—she didn't open the door. She didn't enter the car—as soon as she was able to determine Ms. Ordner was passed out, she called the police to provide aid. The testimony did not indicate she spent much time near the car. She didn't enter the vehicle. And, frankly, had no reason to place any focus on whether or not the car was running nor commit that to memory, that detail, for 18 months.
>
>    Now that's in contrast with Officer Carr's testimony that the car was running. Deputy Carr is an experienced deputy indicating he had hundreds of DUI stops in his career. Deputy Carr not only stood outside the car, he opened the door. He entered into the vehicle. He communicated with Ms. Ordner, conducted field sobriety tests, and assisted with the tow of the vehicle. He spent a substantial amount of time in and around the vehicle. And Deputy Carr testified with certainty that the car was, in fact, running.
>
> * * *
>
>    Ultimately, I am accepting Deputy Carr's testimony that the car was running. That's not to say that I believe Ms. Kemper to have been dishonest. And, frankly, the car could have been started in between the time Ms. Kemper observed the vehicle and when Deputy Carr arrived on scene. However, the Court does believe ultimately that Ms. Kemper, Ms. Kemper's testimony, memory was flawed or her testimony was inaccurate. But I'm

28

accepting the credibility of Deputy Carr's testimony and find that Ms. Ordner was under the influence of an intoxicating compound to a degree which rendered her incapable of safely driving that vehicle."

¶ 73     As acknowledged by the trial court, Deputy Carr is a highly experienced officer who has conducted hundreds of DUI stops. He was able to observe the scene and, based on his extensive experience, make the necessary observations to aid the trial court in determining whether defendant was in actual physical control of a vehicle. Deputy Carr consistently maintained that defendant's vehicle was operational upon his arrival at the scene. This places defendant alone in the driver's seat of a running vehicle, and thus clearly in actual physical control of the vehicle. Whether the vehicle was running when Kemper initially approached it is not decisive, as the vehicle could have been started in the interval between Kemper calling the police and Deputy Carr's arrival, as the trial court noted. We accept the trial court's determination about the credibility of the two witnesses as compared to one another, and thus find that, in addition to proving that defendant drove a vehicle, the State also established that defendant was in actual physical control of a vehicle.

¶ 74                                  III. CONCLUSION

¶ 75     For the foregoing reasons, we affirm the judgment of the circuit court of Cumberland County.


¶ 76     Affirmed.